[Cite as *State v. Brooks*, 2016-Ohio-489.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 102551**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MICHAEL J. BROOKS

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-584941-A

**BEFORE:** Jones, A.J., Kilbane, J., and Stewart, J.

**RELEASED AND JOURNALIZED:** February 11, 2016

**ATTORNEY FOR APPELLANT**

J. Charles Ruiz-Bueno
36130 Ridge Road
Eastlake, Ohio 44097


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: John E. Jackson
　　　　Gregory J. Ochocki
Assistant County Prosecutors
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., A.J.:

{¶1} Defendant-appellant Michael Brooks appeals from the trial court's January 7, 2015 judgment, challenging his conviction and sentence. We affirm in part, reverse in part, and remand for resentencing.

## I. Procedural History

{¶2} In May 2014, Brooks, along with codefendant Sylvester Cotton, was indicted in a multicount indictment. Counts 1 and 2 charged attempted murder; Counts 3 and 4 charged felonious assault; Counts 5 and 6 charged kidnapping; Counts 7 and 8 charged aggravated robbery; and Count 9 charged aggravated burglary. Counts 1 through 9 all contained one- and three-year firearm, forfeiture of a weapon, and repeat violent offender specifications, as well as notices of prior conviction.

{¶3} Count 10 charged grand theft; Count 11 charged theft; Count 12 charged petty theft; Count 13 charged improperly handling firearms in a motor vehicle; Count 14 charged having weapons while under disability; and Count 17 charged tampering with evidence. Counts 13 and 14 contained forfeiture of a weapon specifications. Counts 15, 16, and 18 related solely to codefendant Cotton.

{¶4} After discovery, the case proceeded to a joint trial. Relative to Brooks, with the exception of the having weapons while under disability, the notices of prior conviction and repeat violent offender specifications, the case was tried to a jury. The jury found Brooks guilty of all counts and firearm specifications as charged, and the court found him guilty of having weapons while under disability and all of the notices of prior

conviction and repeat violent offender specifications. The case immediately proceeded to sentencing; the trial court sentenced Brooks to an aggregate 75-year prison sentence, which included consecutive terms.

## II.   Facts

{¶5} The victim, Michael Ewart, testified about the April 25, 2014 incident which gave rise to the charges. On that evening, sometime approximately between 8:30 and 8:40, Ewart returned home and parked his Orange Chevrolet Tahoe SUV on the street near his apartment building.

{¶6} Ewart testified that he normally entered and exited the apartment building through the back door because the front door was generally locked. As Ewart approached the back door, he saw Brooks come "out of the back." Two other males were with Brooks, one of whom was Cotton, and each had a gun. Cotton "came around the back" as Brooks was "coming in the hallway." At that same time, Brooks and the other male "ran out the basement." Ewart testified that he did not know any of the males prior to this incident.

{¶7} Ewart testified that the trio took all the money he had in his pockets, which totaled approximately $140, and then told him to get into his vehicle because they were going to the ATM. All three men had their guns drawn as they walked to Ewart's vehicle.

{¶8} When they got to the vehicle, Ewart initially got in the driver's seat, Brooks got in the front passenger seat, and Cotton and the other male were in the back seats.

However, the three perpetrators decided that they did not want Ewart to drive, so they made him get in the back of the vehicle and Cotton drove. The male in the back with Ewart had his gun drawn on Ewart's chest and told him not to move or "try anything." Brooks told him he was going to die. Ewart testified that Brooks was wearing a red shirt, and that during the drive the other two perpetrators referred to Brooks as "Mike."

{¶9} Cotton drove to a nearby KeyBank. Cotton had Ewart's KeyBank ATM card, which he had taken from his wallet. Cotton went to the drive-through ATM machine, and made Ewart tell him his password to use the card, and then, in three separate transactions, Cotton withdrew funds totaling $560. Surveillance video from the bank captured Cotton withdrawing the money; he was wearing gloves and apparently attempting to hide his face with his "hoodie," which was up over his head.

{¶10} After Cotton withdrew the money, he drove to an alleyway on East 31st Street and Cedar Road in Cleveland. The drive took approximately 20 to 30 minutes and included highway time. Upon arriving at the alleyway, Brooks ordered Ewart to take off all his clothes and leave them in the vehicle, then to get out of the vehicle, walk down the alleyway away from the vehicle, and lay down on the ground. Ewart complied.

{¶11} As Ewart was laying on the ground completely naked, he heard about eight or nine gunshots and realized he had been hit. He heard three car doors closing and the vehicle drive away. He did not know who shot him, but testified that the three perpetrators were the only people in the area at the time. The police arrived

momentarily thereafter.

{¶12} One of the responding officers testified that the police had been in the area when they heard "several" gunshots. They immediately responded to the area where they had heard the gunshots and found Ewart. One officer testified that Ewart was badly bleeding; he said that he had not seen bleeding like that since he had served a tour of duty in Iraq. He thought Ewart was going to die, and did what he could to save his life until emergency medical assistance arrived. Ewart told the police that he had just been robbed and shot, and that the suspects fled in his orange Chevrolet Tahoe. Ewart was transported by ambulance to the hospital. He suffered at least two gunshot wounds and had to undergo lifesaving surgery.

{¶13} Meanwhile, two of the police officers had left the scene in pursuit of Ewart's orange Tahoe. The officers saw the vehicle and, after attempting to pull it over, a high speed chase ensued. The Tahoe eventually crashed into a building located on the campus of Case Western Reserve University. The driver, Cotton, fled on foot, but was caught by an officer in pursuit. Brooks, the front seat passenger, also attempted to flee, but was immediately apprehended. The officer testified that moments prior to the crash, he saw a gun being thrown from the front passenger window. The police did not see or apprehend the third suspect. The booking photo of Brooks shows him wearing a tan, rather than red, shirt, as Ewart testified he had been wearing.

{¶14} The police investigated the scene of the shooting and recovered four bullet casings in the area where Ewart had been found. The gun thrown from the Tahoe

moments before the crash was also recovered. After analysis, it was determined that the four bullet casings from the shooting scene had not been fired from the gun found at the crash scene. It was further determined that a bullet recovered from Ewart's body had not been fired from that gun.[1] No other weapons were recovered. Gunshot residue tests were performed on both Brooks and Cotton; Cotton tested positive for particles indicative of gunshot residue; Brooks testified negative. None of either defendants' clothing were tested for gunshot residue.

{¶15} After his arrest, a pair of gloves was recovered from Brooks's outer garment pocket. Cash was recovered from Cotton — a total of $560, $440 of which was "pushed into" a sleeve of his sweatshirt.

{¶16} Ewart identified both Brooks and Cotton in photo lineups and at trial as two of the three perpetrators who committed the crimes.

{¶17} Brooks presented the testimony of his girlfriend, Antoinette Tatum ("Tatum"). Tatum testified that Brooks had been at her house in Garfield Heights on the day before the incident, April 24, 2014, and spent the night there. The following afternoon, sometime approximately between 4:30 and 5:00, Tatum drove Brooks to his mother's house, which was also in Garfield Heights, so that he could shower. Later, Brooks called Tatum to come pick him up, which she did; they then returned to her house. Tatum testified that at approximately 8:00 p.m., she drove Brooks back to his mother's

---

[1] The other bullet and/or fragments were not removed from Ewart's body because the medical professionals deemed it too risky.

house and did not have contact with him for the rest of the evening after that.

{¶18} On the advice of counsel, Brooks did not testify at trial. But at sentencing, he told the court that he was not involved in the crimes. According to Brooks, during the time that the crimes were being committed, he was walking from Garfield Heights to Cleveland — a walk he admitted would take approximately two hours — to visit a friend whom he had not seen in years and was not even sure if she still lived at the house where he was going. Brooks told the court that upon arriving at the house, his friend was not home, so he called another friend for a ride. The friend Brooks called was not available, but told Brooks he would send someone else to pick him up. Cotton picked him up, and shortly thereafter the police chased ensued. Brooks denied even knowing Cotton and also denied throwing a gun out of the vehicle's window.

## III. Law and Analysis

{¶19} Brooks raises the following two assignments of error for our review:

I. The evidence adduced at trial was insufficient to sustain a verdict against defendant-appellant.

II. The trial court committed prejudicial error by failing to merge the charge of kidnapping into other crimes of similar import.

### Sufficiency of the Evidence

{¶20} In his first assignment of error, Brooks contends that the evidence was insufficient to sustain the attempted murder and burglary convictions. He also contends that the identification of him as being involved in the crimes was insufficient.

{¶21} When assessing a challenge of sufficiency of the evidence, a reviewing

court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

> The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

## A. Identification

{¶22} Brooks contends that because he was booked wearing a tan shirt, and that contradicted Ewart's testimony that he had been wearing a red shirt while committing the crimes, the evidence was insufficient to establish his identity. We disagree. Ewart identified Brooks in both a photo lineup and in court. Ewart testified that he was able to "clearly" see Brooks during the commission of the crimes and that the other perpetrators referred to him as "Mike." There was sufficient evidence to identify him as being connected to these crimes.

{¶23} Further, we cannot consider Brooks's contention that he had an alibi in our sufficiency review. The alibi contention was not presented during trial; rather, Brooks stated it to the court at sentencing. The only testimony provided by the defense at trial as to Brooks's whereabouts on the evening in question was through his girlfriend, Tatum.

Tatum's account of his whereabouts ended at approximately 8:00 p.m. — which was before the crimes commenced — when she dropped him off at his mother's house.

**{¶24}** On this record, there was sufficient evidence to support Brooks's identity as a perpetrator in these crimes.

## B. Attempted Murder

**{¶25}** Brooks contends that the evidence was insufficient to sustain the attempted murder convictions because he was (1) "scientifically excluded from firing a gun that night" and (2) the casings found at the shooting scene were determined to have not been from the gun recovered from the crash scene, which the state argued Brooks had thrown out the window.

**{¶26}** Counts 1 and 2 of the indictment charged Brooks with attempted murder. Count 1 alleged that he "did attempt to purposely cause the death of [Ewart]." Count 2 charged attempted felony murder and alleged that he

> did attempt to cause the death of [Ewart] as a proximate result of * * * committing or attempting to commit an offense of violence that is a felony of the first or second degree, to wit: Aggravated Robbery and/or Felonious Assault, in violation of Section 2903.02 of the Revised Code.

**{¶27}** Upon review, for a reason not advanced by Brooks, we vacate the conviction on Count 2 for attempted felony murder on the authority of *State v. Nolan*, 141 Ohio St.3d 454, 2014-Ohio-4800, 25 N.E.3d 1016. In *Nolan*, the Ohio Supreme Court considered the following question: "Can a person be guilty of attempting to cause an unintended death?" *Id.* at 456. The court answered "no."

**{¶28}** In reaching its determination, the court considered the language of the

attempt- and felony-murder statutes. The attempt statute reads as follows:

> (A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.

R.C. 2923.02(A).

**{¶29}** The felony-murder statute provides in pertinent part that

> (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *.

R.C. 2903.02(B).

**{¶30}** Based on the language of the statutes, the court found that the attempt statute requires that a person cannot commit an attempt offense unless he or she has acted purposely or knowingly. *Nolan* at 455. Under the language of the felony-murder statute, the court found that it "imposes in essence strict liability." *Id.* at 456. Thus, under the felony-murder statute, although "intent to commit the predicate felony is required, intent to kill is not." *Id.*

**{¶31}** In light of the above, the court reasoned:

> an attempt crime must be committed purposely or knowingly and intent to kill need not be proven for the state to obtain a conviction for felony murder, so that a person can be convicted of that offense even though the death was unintended. * * * [But] it is impossible to purposely or knowingly cause an unintended death. Accordingly, we hold that attempted felony murder is not a cognizable crime in Ohio.

*Id.*

**{¶32}** In light of the above, Count 2 is ordered vacated. However, the vacation of Count 2 does not affect the sentence as to that count because the trial court merged Count

2 with Count 1 and sentenced on Count 1.

{¶33} We next consider Count 1, attempted murder. In *Nolan*, the Ohio Supreme Court made it clear that its finding in regard to a charge of attempted felony murder did not apply to attempted murder. *Id.* at 455. Therefore, we consider whether the evidence presented here was sufficient to support an attempted murder conviction.

{¶34} In order to commit the offense of attempted murder as defined in R.C. 2903.02(A), one must engage in conduct that, if successful, would result in purposely causing the death of another. S*tate v. Williams*, 124 Ohio St.3d 381, 2010-Ohio-147, 922 N.E.2d 937, ¶ 25. A defendant can be convicted of attempted murder under the theory of accomplice liability. *State v. Widner*, 69 Ohio St.2d 267, 268-270, 431 N.E.2d 1025 (1982). Under the theory of accomplice liability, anyone who is an accomplice to a crime shall be prosecuted and punished as if he were a principal offender. R.C. 2923.03(F). An accomplice is a person "acting with the kind of culpability required for the commission of the offense," and can act by "aid[ing] or abet[ting] another in committing the offense." R.C. 2923.03(A)(2).

{¶35} Brooks, conceding his presence for the sake of argument, contends that "in a worst case scenario, the intent and steps taken by [him] were robbery and not murder." We disagree. Although the physical evidence did not demonstrate that Brooks was the shooter, there was sufficient evidence that he aided and abetted the shooter. Ewart testified that all three assailants had guns on them throughout the ordeal, and during the car ride Brooks told the victim that he was going to die. This record provided sufficient

evidence to support the Count 1 attempted murder conviction against Brooks.

## C. Aggravated Burglary

{¶36} Count 9 of the indictment charged aggravated burglary, stating, in part, that Brooks "did, by force, stealth, or deception, trespass * * * in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when Michael S. Ewart, Jr., * * * was present * * *." *See also* R.C. 2911.11(A)(2).

{¶37} Upon review, we find that the evidence was insufficient to support a conviction for aggravated burglary against Brooks. Ewart testified that generally no one could enter his apartment building complex through the front door because it was locked. Therefore, Ewart customarily entered through the back door, which, presumably, was unlocked. Ewart testified that on the evening of the crimes, "I got to the back door, he came out the back; and I saw a guy, and around the back. And he came out the basement with another guy. I saw him around the back." As he was testifying, Ewart was pointing to Brooks and Cotton. Therefore, the assistant prosecuting attorney followed up with questions as to who "he" referred to. Ewart testified that Brooks was the first "he" Ewart referred to, meaning that Brooks was the one who "came out the back."

{¶38} In reference to Cotton, Ewart testified that "[h]e came around the back. When I was coming in the hallway, but when them two ran out the basement, he came running back, coming out the door. When I turned to the right, I saw him standing there."

{¶39} This testimony on exactly where the perpetrators were when Ewart approached the back door is minimal and somewhat confusing, but construing the evidence in a light most favorable to the state, as we are required to do, we find that there was sufficient evidence that Brooks was, at some point, inside the apartment building, in the basement. But we do not find that there was sufficient evidence for an aggravated burglary conviction.

{¶40} Specifically, there was no testimony that the theft occurred inside the apartment building. The testimony was that the perpetrators were coming out of the building as Ewart approached. Ewart only testified that he was "coming in the hallway"; he never testified that he actually made it into the building, or that the theft occurred inside the building. We are not persuaded by the state's contention that Ewart testified that he was in the hallway during the encounter. The testimony that the state points to was Ewart's response to the state's questioning of him as to the layout, in general, of the hallway. Ewart never specifically stated, however, that he was in the hallway when he encountered Brooks or that that was where the theft occurred. Thus, the evidence was insufficient to support the aggravated burglary charge.

{¶41} In light of the above, the first assignment of error is overruled in part and sustained in part. It is overruled as it relates to the conviction against Brooks for attempted murder under Count 1; it is sustained as it relates to the conviction against Brooks for attempted murder under Count 2 and aggravated burglary under Count 9. Brooks's sentence will not be affected by our decision as it relates to Count 2, attempted

murder, but it will be affected relative to Count 9, aggravated burglary. On remand, therefore, the trial court shall issue an amended judgment entry of conviction with the deletion of convictions on Counts 2 and 9, and shall resentence Brooks with the deletion of Count 9.

**Merger**

{¶42} In his second assignment of error, Brooks contends that the trial court erred by failing to merge the kidnaping charges in Counts 5 and 6[2] with the attempted murder, felonious assault, or aggravated robbery.

{¶43} R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, prohibiting multiple punishments for the same offense. The statute states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶44} In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Ohio Supreme Court created a two-part test to determine whether offenses are allied

---

[2]The trial court merged the two kidnaping counts.

offenses of similar import under R.C. 2941.25.    *Id.* at ¶ 48.    The *Johnson* test required

the trial court to determine:    (1) whether it is possible to commit one offense and commit

the other with the same conduct, and (2) whether the offenses were committed by the

same conduct, or "a single act, committed with a single state of mind."    *Id.* at ¶ 48-49,

quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 50.    If

both questions are answered in the affirmative, the offenses are allied offenses of similar

import and must be merged.    *Johnson* at ¶ 50.

**{¶45}** However, the Ohio Supreme Court recently recognized that the *Johnson*

two-part test does not offer the complete analysis necessary to determine whether

offenses are subject to merger rather than multiple convictions and cumulative

punishment.    *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 16.

In *Ruff*, the Ohio Supreme Court identified the proper analysis in determining whether the

offenses merge or whether the defendant may be convicted of separate offenses under

R.C. 2941.25(B) as follows:

> A trial court and the reviewing court on appeal when considering whether
> there are allied offenses that merge into a single conviction under R.C.
> 2941.25(A) must first take into account the conduct of the defendant.    In
> other words, how were the offenses committed?    If any of the following is
> true, the offenses cannot merge and the defendant may be convicted and
> sentenced for multiple offenses: (1) the offenses are dissimilar in import or
> significance — in other words, each offense caused separate, identifiable
> harm, (2) the offenses were committed separately, and (3) the offenses were
> committed with separate animus or motivation.
>
> At its heart, the allied-offense analysis is dependent upon the facts of a case
> because R.C. 2941.25 focuses on the defendant's conduct.    The evidence
> at trial or during a plea or sentencing hearing will reveal whether the
> offenses have similar import.    When a defendant's conduct victimizes

more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

*Id.* at ¶ 25-26.

**{¶46}** Brooks contends that there should have been a merger because Ewart was "held at gunpoint and robbed of his belongings, then in the same flow of conduct with a continued animus to commit aggravated robbery, he was taken in his vehicle to an ATM for the purpose of continuing the robbery."

**{¶47}** The record does not support Brooks's contention. Ewart testified that he was initially confronted by Brooks and the others at gunpoint, and was robbed of his wallet. Brooks and the others then forced Ewart to his car and drove him to the bank so that they could withdraw money from his account. At that point, the aggravated robbery was over.

**{¶48}** But Brooks and the others continued to forcibly detain Ewart, driving him at gunpoint for at least 30 minutes. They then went to an alley, where they ordered Ewart to strip naked, and where he was shot. The record indicates that the entire ordeal lasted approximately two hours. On this record, we find that a separate animus existed for the crimes Brooks now contends should have merged. His second assignment of error is, therefore, overruled.

**Conclusion**

**{¶49}** Having found merit to the first assignment of error as it relates to the attempted murder under Count 2, we reverse and remand for vacation of that conviction. Further, having found merit to the first assignment of error as it relates to the aggravated burglary conviction under Count 9, we reverse and remand for vacation of that conviction and resentencing. The judgment is affirmed in all other respects.

**{¶50}** Affirmed in part; reversed in part; remanded for correction of judgment entry of conviction and resentencing.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., ADMINISTRATIVE JUDGE

MARY EILEEN KILBANE, J., CONCURS;
MELODY J. STEWART, J., CONCURS IN PART
AND DISSENTS IN PART WITH SEPARATE
OPINION

MELODY J. STEWART, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶51} I concur with the decision reached by the majority except for its disposition of the aggravated burglary count. I dissent from the decision to reverse that conviction. The majority finds that the evidence presented was insufficient to sustain the conviction for aggravated burglary, namely that the state failed to prove that the theft occurred inside the apartment building. Construing the evidence in the light most favorable to the state as we must, I find the evidence sufficient.

{¶52} As the majority notes, the victim's testimony regarding the burglary is unclear. However, the record is such that one could reasonably conclude that the theft occurred as the victim entered his apartment building. The following are excerpts from the transcript that support this conclusion:

[The court]: When you get out of your vehicle how do you enter your apartment complex?

[The victim]: Like that. [Referencing an exhibit].

Tr. 170

* * *

[The prosecutor]: Before we get to the truck, when [the three perpetrators] are standing in the apartment, are there any weapons?

[The victim]: Yeah. There's three guns drawn.

Tr. 173

* * *

[The prosecutor]: Where was the [codefendant] in the apartment complex when this —

[The victim]: He came around the back. When I was coming in the hallway, but when them two ran out the basement, he came running back, coming out the door.    When I turned to the right, I saw him standing there.

[The prosecutor]: So when you walk in your apartment, where is the basement?

[The victim]: It's to the right. To the right-hand side.

[The prosecutor]: And what's to the left?

[The victim]: There's nothing to the left.    It's a wall and a window and the stairs in front of me that goes up to the apartment, to my apartment.

[The prosecutor]: These gentlemen have guns on you. What do they say at that point?

[The victim]: "Give it up. Give us everything you got." I said, "Take it. You can have it."    They took the money out of my pocket, and that's when they made me go to the truck.

Tr. 175.

{¶53} Although only the victim's responses to the questions — not the questions themselves — constitute evidence, at no time does the victim correct anything referenced in a question that suggests the burglary took place anywhere but inside of his apartment building (or at least in the doorway of his building).    Furthermore, the state did not have to prove that the theft occurred inside of the apartment building.    The statute provides that no person shall trespass "in an occupied structure or in a separately secured or separately occupied portion of an occupied structure" when the victim was present.

{¶54} R.C. 2909.01(C) defines "occupied structure" as any house, building, outbuilding, * * * or other structure, * * * *or any portion thereof*, to which any of the

following applies: * * * (4) At any time, any person is present or likely to be present in it." (Emphasis added.) *See* R.C. 2911.11(C)(1). Again, construing the evidence in a light most favorable to the state, even if I were to agree that the evidence was insufficient to prove that the offense took place when the victim was completely inside of the apartment building, at a minimum the evidence demonstrates that the armed theft occurred in an occupied structure. Based on the foregoing, I find that the state's case was sufficient to prove aggravated burglary.